[Crim. No. 5905. Fifth Dist. May 12, 1983.]

THE PEOPLE, Plaintiff and Respondent, v.
JOHN L. BOTTGER, Defendant and Appellant.

**COUNSEL**

Quin Denvir, State Public Defender, under appointment by the Court of Appeal, and Cynthia A. Thomas, Deputy State Public Defender, for Defendant and Appellant.

George Deukmejian and John K. Van de Kamp, Attorneys General, Robert H. Philibosian, Chief Assistant Attorney General, Arnold O. Overoye, Assistant Attorney General, Eddie T. Keller and Janice Rogers Brown, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**WOOLPERT, J.**—The importance of formula jury instructions becomes most obvious when there are none applicable to the principal issue in a criminal case. Because counsel and the court must innovate, the resulting instructions ensure a technical review on appeal. This is such an appeal. The editors of California Jury Instructions, Criminal (CALJIC) have not yet offered instructions and use notes on soliciting the commission of certain felonies.

Defendant John L. Bottger was convicted by a jury of solicitation for murder. (Pen. Code, § 653f, subd. (b).) On this appeal he urges there were two instructional errors. He also makes a policy argument that his entrapment defense should have been decided by the court rather than the jury.

### FACTS

In April 1981, defendant was in Sparks, Nevada, living out of his truck and picking up occasional odd jobs. During that time he met Morris Wade. The two men passed the time drinking and talking. In one conversation, defendant told

Wade about his relationship with Martha, a married woman in Fresno. Defendant remarked that Martha's husband Billy was "in the way" and that he wished Billy were dead. He then offered Wade $5,000 to kill Billy. When Wade expressed doubt that defendant would get anyone to murder Billy for that amount of money, defendant said he would talk to Martha about it. He subsequently offered Wade $20,000 upon receipt of the proceeds from Billy's life insurance policy. Defendant also commented that killing Billy would be better than having Martha get a divorce because defendant would ultimately gain control over all the insurance and property, rather than only half of the property.

Unbeknownst to defendant, Wade often served as an informant for various law enforcement agencies. Wade contacted an employee in the Criminal Investigation Division of the Internal Revenue Service in Reno and was ultimately referred to Walt Kubas, a special agent for the California Department of Justice. They agreed that Wade would introduce Kubas to defendant as an assistant capable of carrying out the arrangement to kill Billy.

After Kubas was introduced to defendant, defendant began discussing the proposed murder plan. He described items of property, such as a gun collection and MG Roadster, which he expected to find at Billy's house and said Kubas could take whatever he thought he could resell. Although defendant acknowledged he did not have money to pay Kubas, he confirmed that he would be willing to pay him $20,000 when he received the proceeds from Billy's insurance policy or the sale of Martha's mother's house. Defendant further specified he needed to be sure Martha would be out of town when the murder occurred and wanted the murder to look as if it had been committed during a burglary.

Kubas, Wade, and defendant then drove to Fresno. There defendant bought a map on which he wrote Billy's address and drew directions to the house. Kubas and defendant drove to Billy's residence and discussed how Kubas could enter the house without being observed.

To make it appear that he was executing the plan in a realistic, professional manner, and to get physical evidence of defendant's intent, Kubas insisted that defendant sign a promissory note for $20,000. Defendant was reluctant to sign a note, but finally signed one written by Kubas which stated, "I, John Bottger, owe Walt $20,000. $20,000 payable by January 1st, 1982, for services rendered."

Once the note was signed, Kubas took defendant to the bus station and bought him a ticket back to Nevada. They parted after agreeing defendant would call Kubas that Sunday at 5 p.m. and confirm that Martha was not at the Fresno residence before Kubas executed the plan. Defendant never called Kubas on the appointed day.

On the following Wednesday, Kubas approached defendant at a truck stop in Sparks and said, "I think you forgot something." Defendant replied that he had overslept, and asked whether everything had gone smoothly. When Kubas answered, "Yes, he's deader than a door nail," defendant smiled but said nothing. Defendant was then arrested.

Although defendant had been drinking during the ride to Fresno, Kubas said there was no doubt that defendant was sober. Kubas further stated he never saw defendant indicate that he wanted to cancel the plan.

### THE DEFENSE

Defendant agreed he had discussed plans to murder Billy, went to Fresno, and signed a promissory note. However, he claimed Wade initiated the plan to kill Billy and persisted in discussing it until defendant capitulated and allowed him to proceed with the scheme. He maintained he never intended to have Billy killed, although he admitted telling Kubas he wished Billy were dead. He had second thoughts about the plan while the men were on their way to Fresno.

Because Wade had told defendant that he knew people in the Mafia, defendant was afraid to cancel the plans. Defendant also felt threatened when Kubas told him there would be no backing out. Since Wade and Kubas were so involved in the scheme, defendant decided to cooperate and never expressed his reservations about proceeding with it. Furthermore, he felt his excessive drinking had interfered with his mental processes.

Defendant acknowledged the arrangement to call Kubas on Sunday evening, but testified he was to call Kubas to tell him to carry out the plan; if he did not call, the deal was off. Thus, when Kubas confronted him at the truck stop and asked him why he had not called, defendant told him he had not made the phone call because he had cancelled the plan.

### I.

### WAS IT ERROR TO INSTRUCT THE JURY ON IMPLIED MALICE?

#### A. *Was There Invited Error?*

In instructing the jury, the trial court gave a tailor-made instruction based on Penal Code section 653f, subdivision (b), which recited the classic elements of solicitation for murder, including specific intent that another person be murdered. The court then added part of the CALJIC instructions on murder, including definitions of both express and implied malice in the language of

CALJIC No. 8.11.[1] In other instructions the court emphasized that a necessary element of the offense is the defendant's specific intent that a murder be committed.

Defendant contends the trial court erred by instructing the jury on implied malice. He argues that by giving those instructions, the court may have led the jury to believe it could imply malice and find defendant guilty without determining defendant had the specific intent to kill.

The People initially argue defendant cannot raise this issue on appeal because he requested the instruction. In support of this proposition they cite this court's decision in *People* v. *Williams* (1980) 102 Cal.App.3d 1018 [162 Cal.Rptr. 748], in which an appellant objected to an instruction on a lesser included offense of attempted manslaughter. *Williams* simply stated that because the appellant had requested the instruction, the doctrine of invited error prevented him from objecting to it on appeal. (*Id.,* at p. 1025.) The People rely too heavily on *Williams*.

Defendant may raise this instructional issue. The trial court has a duty to avoid instructing the jury on principles of law which are irrelevant to issues raised by the evidence, may confuse the jury, or relieve the jury from determining relevant issues. (*People* v. *Satchell* (1971) 6 Cal.3d 28, 33, fn. 10 [98 Cal.Rptr. 33, 489 P.2d 1361, 50 A.L.R.3d 383].) Because the trial court is obligated to instruct the jury correctly, and because important rights of the defendant are involved, the doctrine of invited error will not apply unless it is clear from the record "that counsel acted for tactical reasons and not out of ignorance or mistake." (*People* v. *Wickersham* (1982) 32 Cal.3d 307, 330 [185 Cal.Rptr. 436, 650 P.2d 311].)

---

[1]The court instructed the jury in relevant part as follows: "Every person who solicits another to commit or join in the commission of the murder is guilty of the crime charged in the Information.

"In order to prove the commission of such crime, each of the following elements must be proved: That a person solicited another person to commit murder or joined in the commission of a murder of another person, that at the time of the solicitation, such person had the specific intent that another person be murdered.

". . . . . . . . . . . . . . . . . .

"Murder is defined as the unlawful killing of a human being with malice aforethought. Malice may be either expressed or implied. Malice is expressed when there is manifested an attempt unlawfully to kill a human being. Malice is implied when the killing results from an act involving a high degree of probability that it will result in death which act is done for a base, anti-social purpose and with a wanton disregard for human life by which is meant [an awareness] of a duty imposed by law not to commit such act followed by the commission of the act forbidden or the act despite that awareness.

". . . . . . . . . . . . . . . . . .

"In the crime of solicitation to commit murder of which the defendant is accused in the Information, a necessary element is the existence in the mind of the defendant of the specific intent that a murder be committed."

Although *Wickersham* dealt with defense counsel's failure to request an instruction, the court noted that "[e]ven where counsel has suggested an erroneous instruction, the doctrine of invited error is not invoked unless counsel articulated a tactical basis for the choice." (*Id.*, at p. 332.) There is no indication here that defense counsel articulated a tactical basis for requesting the instruction relating to implied malice; hence, the invited error doctrine does not operate to preclude defendant from raising this issue.

## B. *The Instructions on Implied Malice.*

In contending it was error to give instructions on implied malice where specific intent must be found, defendant analogizes solicitation for murder to cases involving attempted murder or assault with intent to commit murder in which the jury must find the defendant had a specific intent to kill. Courts have found error in such cases when jurors were given instructions on implied malice. (*People* v. *Collie* (1981) 30 Cal.3d 43, 61-62 [177 Cal.Rptr. 458, 634 P.2d 534]; *People* v. *Murtishaw* (1981) 29 Cal.3d 733, 764-765 [175 Cal.Rptr. 738, 631 P.2d 446]; *People* v. *Martinez* (1980) 105 Cal.App.3d 938, 945 [165 Cal.Rptr. 11].) In *Murtishaw,* the Supreme Court stated, "[O]nce a defendant intends to kill, any malice he may harbor is necessarily express malice. Implied malice, as defined in CALJIC No. 8.11, cannot coexist with a specific intent to kill. To instruct on implied malice in that setting, therefore, may confuse the jury by suggesting that they can convict without finding a specific intent to kill." (29 Cal.3d at pp. 764-765, fn. omitted.)

Because solicitation for murder also requires a finding of specific intent to kill or express malice, defendant maintains the reasoning in *Collie* and *Murtishaw* compels the conclusion that in this case it was error to instruct on implied malice. The jurors may have felt they could convict defendant without finding he had intended that Billy be killed. Instead, the jury might have found implied malice by concluding that defendant's participation in arranging to murder Billy exhibited a wanton disregard for life or created a situation with a high degree of probability it would result in death.

The People do not directly confront defendant's argument. First, they argue there was no reversible error because the jury was not determining whether defendant harbored malice but was determining whether he had solicited Kubas to commit a murder. They rely on *People* v. *Baskins* (1946) 72 Cal.App.2d 728 [165 P.2d 510], a solicitation for murder case in which the appellate court held defendant had been erroneously denied any instruction defining murder. Nevertheless, the court concluded the omission was not reversible error because "[t]he question before the jury was not whether a murder had been committed but whether [the defendants] had solicited Davis to commit a murder." (*Id.*, at p. 733.)

Here we are concerned with too many, rather than too few, instructions. The inclusion of misleading, contradictory instructions, allowing the jury to disregard a necessary element of the offense, is more crucial in this case than the omission of the instruction in *Baskins,* where the court concluded the jury could satisfactorily resolve the question before it.

Second, the People argue specific intent to kill is not a necessary element of solicitation to murder. They contend the instruction on malice is significant only to the extent it is used to define the crime of murder, and is not relevant to the issue of *defendant's* intent. Since no murder or attempted murder was committed, the People argue no finding of malice was required. We disagree.

The crime of solicitation to commit murder occurs when the solicitor purposely seeks to have someone killed and tries to engage someone to do the killing. This simplified concept becomes unduly complicated if the court is not careful to define "murder" with emphasis on the solicitor's specific intent. The solicitee's expected state of mind and action in carrying out the request is irrelevant.

"[Solicitation] is complete when the solicitation is made, and it is immaterial that the object of the solicitation is never consummated, or that no steps are taken toward its consummation." (*People* v. *Burt* (1955) 45 Cal.2d 311, 314 [288 P.2d 503, 51 A.L.R.2d 948].) It is immaterial that the solicitee may be an undercover agent whose only intent is to arrest the solicitor. (*People* v. *Adami* (1973) 36 Cal.App.3d 452, 457 [111 Cal.Rptr. 544].) For the same reason, it is irrelevant that the solicitee may be so intoxicated he could not be convicted of anything higher than voluntary manslaughter, or that he is an incompetent who could not be convicted of any crime.

The solicitation may develop into an attempt, then murder. The differences in these crimes relate to the people involved and the progression of the activity toward the criminal objective. (*People* v. *Adami, supra,* 36 Cal.App.3d 452, 455.) When attempted murder is charged, the definition of the term "murder" remains narrow: " 'The wrongdoer must specifically contemplate taking life, and though his act is such as, were it successful, would be murder, if in truth he does not mean to kill, he does not become guilty of an attempt to commit murder.' [Citation.]" (*People* v. *Miller* (1935) 2 Cal.2d 527, 533 [42 P.2d 308].)

In *People* v. *Murtishaw, supra,* 29 Cal.3d 733, 762-765, the court analyzed the crime of assault with intent to commit *murder* and held the mental element must be limited to an intent to *kill.* We see no reason to interpret "murder" more broadly in a solicitation case. ██ Solicitation instructions must be similarly limited to exclude reference to implied malice. We distinguish conspiracy to commit murder cases in which the various degrees of homicide may

be considered by the jury in appropriate circumstances. The conspiracy statute makes the punishment depend upon the nature and degree of the substantive offense. (*People* v. *Horn* (1974) 12 Cal.3d 290, 297 [115 Cal.Rptr. 516, 524 P.2d 1300].) Penal Code section 653f, subdivision (b), is not comparable.

### C. *Was There Prejudicial Error?*

■ As the instructions on implied malice were inappropriate and potentially confusing, we now determine whether they were prejudicial. We have reviewed the opening statements and closing arguments. No reference was made to implied malice. Counsel emphasized the effect of diminished capacity on specific intent and the entrapment defense. We find similar emphasis in the instructions, as the words "specific intent" appear 16 times.

The following excerpt from defense counsel's closing argument indicates her central point: "The significance of that [defendant's extensive drinking] goes to the fact that the crime of solicitation to commit murder requires that in his head, in Mr. Bottger's head, that he, first of all, actively asked somebody to kill Mr. Miles, and that at the same time that he asked somebody else to kill Mr. Miles, he had the specific intent that Mr. Miles be murdered.

"Now, the Judge will be reading you an instruction—a lot of these instructions are somewhat complicated. They are—they're not in ordinary common sense language. We'd ask you to use your common sense, but unfortunately, the jury instructions don't seem to use a lot of common language.

"But, one of the instructions is that if you find that because of intoxication, that is, the use of alcohol, that the alcohol interfered with Mr. Bottger's mental processes such that he didn't have the intent to have Mr. Miles murdered, then you must find him not guilty of that crime.

"I've talked about two important defenses to our case. One of them is the entrapment defense and one of them is the alcohol defense. But, remember, I'm not saying that he was so blitzed out of his mind that he didn't know what was happening. If you find simply that because of his intoxication it interfered with his thought processes such that he did not really analyze the gravity of the situation and did not have that specific intent to kill, you must find him not guilty of the crime."

From the People's argument we draw these high points: "The issue is did he want to have Billy Miles eliminated."

"You tell me he didn't have the specific intent. He was probably just as sober on that moment as he was on any other."

In both *People* v. *Murtishaw, supra,* 29 Cal.3d 733, 765, and *People* v. *Kozel* (1982) 133 Cal.App.3d 507, 525 [184 Cal.Rptr. 208], implied malice instructions were found to be harmless error. In each case instructions on other

charges made it clear the jurors rejected implied malice in favor of express malice. In *Murtishaw* the court also noted specific testimony that the defendant deliberately aimed and fired a gun. (*Murtishaw, supra,* at p. 765.) For different reasons we find the instructions harmless in this case.

A solicitation case focuses on the intent and activity of the person who engages another to commit his criminal objective. It is irrelevant where and how the objective is accomplished, if at all. (*People* v. *Burt, supra,* 45 Cal.2d 311, 314.) Although concerned with the definition of the crime solicited, the jurors are not as directly involved with the definition of that crime as they are in the case of an attempt to commit the crime. In the latter case the line between mere preparation and an attempt, and the importance of activity toward a criminal objective, are of particular concern. (*People* v. *Staples* (1970) 6 Cal.App.3d 61 [85 Cal.Rptr. 589].) Implied malice instructions could be misconstrued to allow the substitution of certain kinds of activity for specific intent.

In this solicitation case we find it highly unlikely that the jurors used CALJIC No. 8.11 in an improper way. "Malice is expressed when there is manifested an intent unlawfully to kill a human being" appropriately refers to the solicitor's specific intent. "Malice is implied when the killing results from . . ." in this context refers to inferences to be drawn from potential acts of the solicitee in a killing which never happened. No reference is made to the acts of the solicitor in engaging another to commit a murder. Nothing in the record even slightly suggests that the jurors were misguided in this respect. In less than an hour and a half the jurors reached a verdict which rejected both diminished capacity and entrapment. Applying the test of prejudice established in *People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243], we find the instructional error nonprejudicial. It is not reasonably probable that a result more favorable to defendant would have been reached in the absence of the portion of the instructions relating to implied malice.[2]

II.

### DID THE COURT ERR IN FAILING TO GIVE
### CALJIC NO. 17.01 SUA SPONTE?

 Defendant was charged with one count of solicitation which occurred on or about April 24, 1981. He contends the jury was presented with several acts

---

[2]We do not suggest that in solicitation to commit murder cases the use of the CALJIC No. 8.11 implied malice sentence would always be harmless error. Here, the heavy emphasis on specific intent in the instructions, combined with the manner in which the intent issue was presented the jurors in argument, sufficiently overcame the instructional error.

which could have sustained charges of solicitation for murder. Thus he argues the trial court should have given CALJIC No. 17.01, which would have informed the jurors that they were required to agree on the specific act which constituted the crime of solicitation.[3] We disagree.

Where the evidence tends to show a defendant committed more than one offense, yet he is charged in only one count, this court has stated the jury must be instructed that all twelve jurors must agree on the particular act which constitutes the offense. (*People* v. *Madden* (1981) 116 Cal.App.3d 212, 219 [171 Cal.Rptr. 897].) If the case mandates the use of the instruction, the court must give the instruction, *sua sponte*. (*People* v. *Hefner* (1981) 127 Cal.App.3d 88, 97 [179 Cal.Rptr. 336]; *People* v. *Epps* (1981) 122 Cal.App.3d 691, 704 [176 Cal.Rptr. 332].) There is a limited exception to this rule, the "continuous conduct exception." This exception applies where the offenses have such a close temporal relationship that they are part of one transaction or the offense is one that may be continuous in nature. (*People* v. *Diedrich* (1982) 31 Cal.3d 263, 281 [182 Cal.Rptr. 354, 643 P.2d 971]; *People* v. *Madden, supra*, 116 Cal.App.3d at p. 218.)

Defendant incorrectly asserts that each of the various acts, such as driving to Fresno or signing the promissory note, could have sustained a charge for solicitation. The crime of solicitation consists of asking another to commit one of the crimes specified in Penal Code section 653f, with the intent that the crime be committed. (*People* v. *Rubin* (1979) 96 Cal.App.3d 968, 974 [158 Cal.Rptr. 488].) The crime was therefore complete when defendant asked Kubas to commit a murder with the intent that the murder be committed. The subsequent acts could not be segregated to constitute separate offenses of solicitation; they were relevant only as manifestations of defendant's intent that the murder be committed.

## III.

### SHOULD THE ENTRAPMENT DEFENSE BE AN ISSUE FOR THE COURT RATHER THAN THE JURY?

In *People* v. *Barraza* (1979) 23 Cal.3d 675 [153 Cal.Rptr. 459, 591 P.2d 947], the State Supreme Court adopted the objective test of entrapment. Focusing on the acts of law enforcement, the test is: "[W]as the conduct of the law enforcement agent likely to induce a normally law-abiding person to commit the offense?" (*Id.*, at pp. 689-690.)

---

[3]CALJIC No. 17.01 states: "The defendant is charged with the offense of _____. He may be found guilty if the proof shows beyond a reasonable doubt that he committed any one or more of such acts, but in order to find the defendant guilty, all the jurors must agree that he committed the same act or acts. It is not necessary that the particular act or acts committed so agreed upon be stated in the verdict."

Because the entrapment defense is concerned with the degree and nature of pressure utilized by law enforcement agents to induce persons to commit crimes, and is meant to deter overbearing police conduct, defendant argues the determination of whether entrapment occurred should be made by the court rather than a jury. He recites arguments in favor of judicial resolution of the entrapment issue presented by Justice Traynor's dissent in *People* v. *Moran* (1970) 1 Cal.3d 755, 763-766 [83 Cal.Rptr. 411, 463 P.2d 763], and by the Michigan Supreme Court in *People* v. *D'Angelo* (1977) 401 Mich. 167 [257 N.W.2d 655, 657-660].

■ Nevertheless, the California Supreme Court has specifically stated that "[i]n view of its potentially substantial effect on the issue of guilt, the defense of entrapment remains a jury question under the new [objective] test." (*People* v. *Barraza, supra,* 23 Cal.3d 675, 691, fn. 6.) Therefore, the entrapment issue was a proper one for the jury in this case.

The judgment is affirmed.

Zenovich, Acting P. J., and Hanson (P. D.), J., concurred.

A petition for a rehearing was denied June 7, 1983, and the opinion was modified to read as printed above. Appellant's petition for a hearing by the Supreme Court was denied July 20, 1983.